Case No. 15-1479 Gianni-Paolo Ferrari v. Ford Motor Company Oral argument not to exceed 15 minutes per side. Ms. Charlotte Croson for the appellant. Good morning, Your Honors. Charlotte Croson for Appellant Gianni Ferrari in this matter. I would like to reserve 3 minutes for rebuttal if I may. May it please the Court. This case is the paradigmatic example of the trial court not being able to see the forest for the trees. The trial court missed the forest in this case because it committed at least 3 fundamental errors of fact-finding in this matter. First of all, it failed to credit evidence which demonstrated a question of fact that Mr. Ferrari was qualified for promotion to the skilled trades. Now, as I pointed out in my brief, Your Honors, and I think I briefed it. If you have any questions about it, let me know. But I think that this issue of qualifications doesn't properly belong here in the prima facie case. I think it belongs in the pretext inquiry. But I will address it as a qualification issue because I think there's serious issues of fact here that the trial court disregarded. In terms of how the trial court committed error, what the trial court held at page 25 of its brief is that Ford's alleged worry about quote, plaintiff's potential continued opioid use, end quote, was as a matter of law, in fact, sufficient to render him not qualified as defined by the ADA for promotion to the skilled trades position. The court went on and repeated this error throughout its opinion when it said defendant was concerned with plaintiff's apparent continued use of prescription medications. And then it went on and said it was entirely possible for concerns about addiction and withdrawal to have motivated Ford. I submit to this court that potential, possible, and apparent are not the standard for summary judgment. The court refused to credit any information, any testimony from anybody that when Mr. Ferrari, at the point when Mr. Ferrari was denied promotion to the skilled trades, there was a question of fact whether he, in fact, was taking any kind of prescription medications. He said he wasn't. I'm speaking only for myself, but I think I'm interested in hearing not what errors the district court made, because I think the district court might have made some errors, but the thing that concerns me in the case is how you produced sufficient evidence for us to, for a trier fact to find pretext. All right, I will address the pretext issue, Your Honor, and I appreciate you bringing that up to me. I think there's a couple of things going on. Defendant Ford below argued that it imposed restrictions on Mr. Ferrari because it had concerns about his prescription medication use. I think there's sufficient evidence to call that motivation into question, and the trial court didn't, didn't, that evidence, that testimony, and that irrelevant admissible probative evidence of motive never even made it into the trial court's opinion. Let's just talk about, there's direct evidence, I think, that Dr. Brewer was motivated by Mr. Ferrari's record of disability. Well, Mr. Brewer, the doctor is not the employer. Well, the direct doctor, however, is the one who made the decision about what restriction. Well, there's plenty of case law that it's what the employer had a basis to believe, not what somebody extraneous to the company thought. Well, I would suggest, first of all, that Dr. Brewer was not extraneous to the company. She was the plant doctor. She's the one who instituted unnecessary restrictions on Mr. Ferrari, and that unnecessary restriction. You're going to contend that she was a plant doctor in the sense that somehow her actions are attributable to the defendant. I mean, there's several steps you'd have to go through there. Well, I think the question is a little bit different. I think the question is, is Dr. Brewer put restrictions on Mr. Ferrari? She did so based on, allegedly, her concerns about his prescription medication use. Now, whether he was using prescription medications is a question of fact, but it's also a question of fact whether that alleged use of prescription medications actually required him to be restricted. And then it was those restrictions that then led to him not being promoted. The restrictions put in place were completely unnecessary for his actual physical condition. And in addition, there's no evidence that even if he was using prescription medications, that he was affected thereby. I draw this court's... In that argument, how do you respond to the binding decision of the independent medical examiner? Okay. First of all, we dispute that it was a binding opinion. Second of all, that opinion is not as clear as either the... What was the basis of your dispute that it was binding? There's no evidence in the record that it was binding. There's assertions that it was binding. There's nothing in the record by the CBA that says it was binding. But leaving aside the question of whether it was binding or not, I don't think that that report is as clear as either Ford or the trial court would believe. When Dr. Friedman made his report, what he said was, at this time, I am uncertain whether Mr. Ferrari has continued on medications. He doesn't know. Mr. Ferrari says he's not. Mr. Ferrari says he's weaned himself off of, but the record is not clear. As of February... The record was that he was prescribed opiates. He was prescribed pain medications. And the record then shows that the last time there's any evidence that he may have taken pain medications was on January 7, 2013, when he made a report to Dr. Calton about those pain medications. But as of February 28, 2013, when Mr. Ferrari was denied entry into the skilled trades based on a restriction given by Dr. Brewer, there isn't any evidence that he's on pain medications. But there's evidence that it would take three or four months for him to get opioids out of his system and to be free of them. And the time period you have cited is within that time period. Okay. And, again, let me revisit the question of whether Mr. Ferrari was actually impaired by any alleged opiate use. I direct this Court's opinion to a case, Bates v. Dura Auto Systems. The citation to that is 767-5366. And, in particular, I direct this Court's attention to the concurrence in that matter by Judge Gibbons. Now, this case is a little factually different. In Dura-Ace, the plaintiff employer had instituted a blanket policy. They tested employees for illegal drugs. They tested employees for legal prescription drugs. They carried with them a warning that says, don't operate heavy machinery. Now, when those test results came back, every single employee who was either on illegal drugs or was on legal prescription drugs with a doctor's… You know, that case was really, really different because the problem there, among other problems, was that no inquiry was made into whether the drugs actually were affecting performance. Here, there was an extensive and exhaustive inquiry. And at the end of the day, the employer was left with an opinion from a medical doctor that his performance could be impaired by the medication he was taking. Now, if the activity in question is being on these very tall ladders, a reasonable person could easily conclude that it was just flat in the face of the medical opinion, even if there were conflicting medical opinions, that it was just flat, unsafe for him to be up there and that the employer did not want to take that risk for his safety. Well, I understand your point, Judge Gibbons, but again, our feedback debates were the same situation applied in that these employees who were on this prescription medication came in with notes from their doctors. And these notes from their doctors, much like here, Mr. Ferrari's note from his doctor. The problem I saw in that case, among others, was that the employer was completely disinterested in whether or not performance was affected. That's certainly not this case. Well, there's no evidence here that performance was affected. I mean, we have Mr. Ferrari's own doctor, and his own doctor says, you know what, he's not affected by this. All of these side effects that you're concerned about, whether that be dizziness, whether that be withdrawal, whether that be detoxification, they simply don't apply. No, no, no. None of this is happening to him. But wasn't the follow-up question to his doctor, and how do you know this? And the doctor's response was, because the patient tells me that he is not affected by it. I think that's part of it. I think also that Dr. Cole... Isn't that a significant proof problem that the doctor's opinion is based solely on the report of the person who's taking the medication? So doesn't the question become, what is an independent or objective standard regarding the taking of opioids during up on the high ladder or working above a certain level? Which were the only two restrictions, and they were limited to two. Yes. How can you help me understand why the opinion of the person taking the drugs can be the basis on which we would make a decision? Well, first of all, who would know better than Mr. Ferrari whether he's experiencing something like dizziness? Obviously, Mr. Ferrari has every reason to lie. He wants this job. Or to even be unaware of the danger of the medications he's taking. Well, if that's the position that Mr. Ferrari may lie, I think that's a jury question. Isn't it a jury question? At the end of the day, the employer had Dr. Brewer left the restrictions in place that prohibit him from taking this job, and he did that, he or she, I can't remember what the gender of the various doctors is. That was done, that opinion was given based on the opinion of Dr. Friedman, correct? And that's the information the employer had. Well, I think the information the employer had was very limited. It was, he may be on prescription pain medications. He says he isn't. Dr. Friedman's report is not dispositive on that issue. Nor does Dr. Friedman say, you know, if he is on prescription pain medication, you know, this is what I would do. He says if he's currently... Here, is the evidence of pretext you have that you think the doctor's opinions can be assailed? I think the evidence of pretext is that there's no connection between Mr. Ferrari's alleged opioid or prescription medication use and any effect that defendant can point to that Mr. Ferrari was experiencing as a result of that prescription pain medication. There's no objective basis to say that Mr. Ferrari can't climb a ladder. He can climb a ladder. Dr. Brewer's entire basis for imposing any restrictions is that, quote, apparently Mr. Ferrari is still taking medications and consequently some restrictions should remain in place. That's an email... Is it your position, is the outcome of your position that we always have to take the understanding of the layperson who's taking the drugs? I'm concerned about the fair ability of an independent medical practitioner to opine that some opioids are dangerous, period. If you're on this drug, you can't operate heavy machinery or you cannot climb 20 feet into the air. Help me with the outcome of your argument. I think the outcome of the argument is that you do have to take into account the reported effects from the plaintiff. I think every case that looks at this says the same. Wurzel says the same. Hoskins says the same. You have to talk to the person. That's what an individualized inquiry is. You have to talk to that person. If you look to the direct threat defense, part of it is you talk to the person. How do they experience their disability? How do they experience what is happening to them and what do they report? To make a reasonable accommodation. Excuse me. Thank you. Just a second. I know you have your red lights on, but just one last question. What role does your client's neck injury play in your analysis? Are you giving up any claims about the neck injury? What would you have to say about that? I think the trial court correctly held that Mr. Ferrari was disabled because he had a record of a disability. And I think this record of disability is what defendant was actually looking at when it assigned these restrictions to Mr. Ferrari. They kept him from the skilled trades position but didn't keep him from other equally, the skilled trades promotion, but didn't keep him from other equally dangerous jobs on the plant floor, where one would think these sort of inchoate concerns about the bad effects of prescription medications would have just as much force as they would in a skilled trades promotion. Mr. Ferrari, shortly after he was denied the promotion, was put on the plant floor. He's moving axles overhead. It's what you're saying, then, that all your contentions have to do with the opiate use. Anything about the neck injury is not in the case anymore as far as you're concerned. Is that what you're telling me? I don't think that's accurate, Your Honor, and I apologize if I'm not being clear. I'm saying the record of Mr. Ferrari's disability, the record of his neck injury, is what motivated Ford not to promote him to the skilled trades position, and that the allegations about prescription medication use are nothing more than pretext so that he could make an improper decision based on his record of disability being his neck injury. And if you look to Dr. Brewer's e-mails. I think I understand your position now. Thank you. Thank you. Good morning. Good morning. Turn on your light, if you please. May it please the Court, Julia Turner Baumhardt on behalf of defendant Ford Motor Company. First of all, this is not your typical ADA case. Mr. Ferrari has never been without a job. He's never missed a paycheck. For 10 years or more, Ford accommodated Ferrari's neck injury. Ford also accommodated a lengthy psychiatric condition. And for 10 years or more, Ford found clerical work to keep him busy or paid him to stay at home. The only thing Ford did not do was place Mr. Ferrari in an inherently risky job, in the most dangerous part of the Van Dyck plant, until he presented proof that he had weaned himself off the opioids that his medical records confirmed and his doctors, in their testimony confirmed, showed that he had been on and was still taking opioids. That time is completed now, is that correct? And he has been moved back to the available position for the apprenticeship program? Yes, Your Honor. He, as of September, well, as of May 2013, he tested clean for opioids. And in September 13, he reported to the Joint Apprenticeship Committee that he was now unrestricted, and he's at the top of the wait list for the next skilled trades apprenticeship opening. And that happened as soon as Mr. Ferrari presented the proof that Ford had asked for. And in the meantime, he's performing the very job Ford hired him to do in taking home his paycheck every week. Now, I'm a little surprised to hear that Mr. Ferrari's position is that it's really the record of his neck injury and not the opioids at all that caused his bypass, because his complaint was pleaded and pursued as the opioids being the problem. And for that reason, well, for three reasons, the court should affirm the district court's grant of summary judgment. The district court applied the correct prima facie test. It applied the test this court in Manette v. EDS adapted to the particular circumstances of those ADA cases where the employer acknowledges it based an employment decision on an employee's condition. But you would agree, wouldn't you, that our Wexler case makes clear that you cannot consider the employer's non-discriminatory reasons at the prima facie stage? I agree that that's what Wexler says. But I also point to the holding in Manette that no iteration of the McDonnell-Douglas framework is appropriate in analyzing ADA cases where the employer admits that it based its decision on the employee's condition, whether or not that condition turns out to be a disability as defined by the statute. And so how would you explain how the test works? Are you claiming you are in a direct proof case or in an indirect proof case under Manette? It's a direct proof case. And that's what the district court asked that the parties submit supplemental briefing on. And in response to that request by the district court, both parties agreed that the direct proof Dominovich case, the three-factor case, was the appropriate test to apply. Does it make any difference how you analyze? I mean, I understand that there might be a different analytical framework, but does that have anything to do with the outcome ultimately? Ultimately, I do not believe it does because you still have to prove under a but-for standard the reason was the disability. And here the but-for standard supplies only one answer, which was the opioids that was the concern. There's no reflection of any concern about his neck injury once it was confirmed by all doctors that he no longer needed those neck injury restrictions. So you're correct, Your Honor, that it doesn't matter whether you use either of the two prima facie tests that the district court analyzed in terms of Monette. The result is the same. He cannot raise a question of fact that the neck injury was the but-for cause of him being bypassed. So what about the pretext? First of all, as this court held in Lewis v. Humboldt, it is a but-for standard that applies. So there is no mixed motive analysis. But even if there was, what Ferrari is arguing here is that there are these emails that suggest that Dr. Brewer was always concerned about the neck injury and not about the opioids. But those emails show just the opposite. Did that create a dispute of material fact? First of all, I don't believe so because you shouldn't get to pretext if you're following the but-for standard. But I think... Help me understand your argument on pretext not being at issue any time the issue is whether there was a retaliatory or an improper motivation on the part of the employer. Isn't pretext the core inquiry in that? If you get to pretext, yes. You do say, okay, what is this evidence that they're relying on for pretext? And what the evidence is doesn't say anything about his back injury. So it's not evidence that Ford was considering or Dr. Brewer was considering his back injury. In fact, what it says is that she's concerned about the opioid use and wanting to be sure she gets the accurate information from Dr. Cole in response to her questions about the opioid use. The same for her conversation or her email with Dr. Heckman. She says Ferrari needs mental clarity as well as physical endurance to work in the powerhouse. That's her concern. And Ferrari raises the issue of the fact that Dr. Brewer mentions workers' compensation. But those... She raises it because those are questions the workers' compensation representative from Sterling presented to her. She didn't know the answers. She asked Dr. Heckman. He didn't know the answers. End of story. And the questions, if you look at them, don't suggest any concern about his neck injury from the bypass situation. They're just perfectly reasonable questions that workers' compensation representatives who have been paying on an open award for 10 years would have. They've been paying for Dr. Cole's office visits. They've been paying for the pain medications. And so the first question is, so what should the workers' compensation representative do if they get another invoice? Next question, does she have to petition the court to stop paying the invoices? And the third question... Those all relate to the neck injury, don't they? They relate to it, but it has nothing to do with... based on the doctor's representations. And so they're just saying, what do I do in the future? If I still get claims, what do I do? If he gets re-injured, do I automatically pay or does he have to file a new claim? They're just administrative questions that they asked her because she was the only doctor dealing with him at the time. She didn't know the answers. She referred him to Dr. Heckman, and Dr. Heckman didn't know. And at that point, they were completely out of that loop. So what is called evidence of pretext here really has nothing to do with the bypass decision, which was based strictly on the opioid use. Judge Levy, during the summary judgment hearing, asked the question of Mr. Macy, who was representing Mr. Ferrari in the district court. She said, so if it's the record of a neck injury, how do you show that that caused the bypass? And he basically said, I don't have to because the Whitfield test applies, and that doesn't require me to show that it was actually the cause. He's got a disability. I don't necessarily need to show a causal link to the challenge decision. I think a few minutes ago, I heard you say, and this sent me on an examination of the plaintiff's brief, that you didn't think the causation element was a part of the pretext analysis. Did I hear you say that? If I said that, I didn't mean it that way. I think that pretext is a way of showing causation. Well, typically, causation is going to be key to pretext because the plaintiff is going to claim in any case that the alleged discrimination, whatever it is, was in fact the real basis for the decision. And the defendant is typically going to claim there's insufficient evidence to find that it was. And it just seems to me that causation is inevitably linked to pretext. I don't disagree with you on that. And maybe it's... Well, maybe you didn't. Maybe I misunderstood what you were saying, but I've been puzzling over that. I agree with what you're saying. And if I said something that sounded different, I apologize. Probably I misunderstood. Any other questions on pretext? I would like to take a minute just to address the direct threat situation because there has been an intervening opinion of this court affirming the Michael v. City of Troy case that was cited repeatedly in Ford's brief. And in that case, the court took an individualized inquiry case involving a safety-sensitive job like this one and said, really, this fits the direct threat mold. And that's the same thing we have here. And, Michael, you had a police officer, an armed police officer, who had been evaluated by several physicians. Two of them, who did the most complete evaluation, had found he was cognitively impaired. Two others, or three others, said he wasn't cognitively impaired. And the court said that because the individualized inquiries done by the two doctors who had reviewed the job description, who had truly conducted an individualized inquiry, were compelling and satisfied the individualized inquiry situation. The company, the city, did not need to wait for a civil rights complaint that this person had used a weapon inappropriately or reacted inappropriately before they determined that he was unable to perform the essential functions of the job, despite the conflicting evidence from other doctors. I also would like to say that the FMLA claim, I haven't addressed it, but I think, without a doubt, there is no FMLA violation in this case. All right, let's see if July is on there. Your Honor, I just want to quickly mention this direct threat that opposing counsel brought up. There's very specific factors that need to be evaluated regarding direct threat. Duration of the risk, the nature and severity of the potential harm, the likelihood of potential harm, and the imminence of the potential harm, none of which were briefed or addressed by defendant below. So I think bringing it, and defendant below explicitly said, we're not relying on direct threat. So to bring it up at this late date, I think, is a little disingenuous. But I want to address Judge Tranz's question about pretext. I think the best evidence of pretext is exactly the emails that opposing counsel was talking about, was referencing. When Dr. Brewer put Mr. Ferrari, I was talking to Mr. Ferrari about his physical, what did she say in her email to Dr. Heckman on February 7th? She said, we are concerned, quote, with a new date of injury if restrictions are lifted, unquote. That refers to his neck injury, his disability, his actual disability. And then she notes that the unanimity of medical opinion is that Mr. Ferrari needs no restrictions, none. And they're experts. She said, well, our experts are going to come back and say that too. And so what she does is she begins casting around for some other reason to put Mr. Ferrari on restrictions. And she lights upon this prescription medication that is in his record. Now, opposing counsel says, you know, the minute that Mr. Ferrari told us he's off the prescription medication, we put him back eligible for the promotion to skilled trades. But let me tell you something. Mr. Ferrari asked for a drug test. He asked for, he begged for a drug test to prove he's not on these prescription medications. That was denied. You're a tradition under the, I'm not sure whether it's under the collective bargaining agreement or under independent rules at Ford, that they do not do drug tests at the request of employees. That may be the case, but there's other evidence that goes to pretext here. Mr. Ferrari asked for his medical file. He asked for it repeatedly beginning in February. He says, I want my medical file. I want to know why I'm on these restrictions. But did he get it within the time frame, the, what, 15 days? He didn't get it before Dr. Brewer made her decision on restrictions. And it was Dr. Brewer's decision not to send it to him. She said, I will not send it to him because he will immediately ask his personal physician to take him off the prescription medications so he won't have any current restrictions. She withheld it for the purpose of him not being able to take himself off the prescription medications. Now, opposing counsel makes a big deal about, you know, as soon as Mr. Ferrari told us, Mr. Ferrari didn't even know why he was restricted until April, April 15th of 2013. That's in the record at 36-21. He finally, finally gets an email from Dr. Heckman that says, you know, the reason you're on these restrictions, that we won't take off, is because, you know, you're apparently being weaned off narcotics. There's active prescriptions. And that's why restrictions were entered. Mr. Ferrari immediately gets himself taken off the prescriptions, gets a drug test, and he's clear. So for counsel to say that, you know, hey, all he had to do was take himself off the prescriptions, Dr. Brewer's conduct, her very words, are contrary to that. He withheld information so that he couldn't. The minute he got that information, he went ahead and took necessary steps. What about this opinion by Dr. Freeman that the opiate might affect his duties? What kind of weight should be given to that opinion? Okay. So I would refer this court to the question posed to Dr. Freeman that says, do you feel the prescribed medications impact his performance? Did this affect his clinical performance and response during your exam? Dr. Freeman did not answer that question. There is no evidence in Dr. Freeman's report that Mr. Ferrari was affected at all. He says, at this time, I am uncertain whether he's continued on medication. Though the use of opioids may affect his performance. But he doesn't say, this is how his performance was affected in front of me. This is what my exam revealed. Every doctor cleared Mr. Ferrari physically. If these prescription pain medications had any effect on Mr. Ferrari's physical functioning or cognitive functioning, which is what Dr. Brewer initially expressed that she was worried about, why didn't one doctor in six pick up on that? And Dr. Brewer didn't pick up on it. Dr. Brewer examined him. There's absolutely no evidence in this record that any doctor found any adverse effects as a result of any of these prescription medications. And when asked that direct question in his exam, Dr. Freeman never answered it because there was nothing. All right. Thank you.